1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

BENJAMIN WISE,

                Plaintiff,

       v.

MAXIMUS FEDERAL SERVICES, INC.,
et al.,

                Defendants.

Case No. 18-CV-07454-LHK

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Plaintiff Benjamin Wise ("Plaintiff") brings suit against Defendants United HealthCare Services, Inc. and UnitedHealthCare Insurance Co. (collectively, "UHC"), as well as Defendant MAXIMUS Federal Services, Inc. ("MAXIMUS") (collectively, "Defendants"), with regard to a denial of benefits to which Plaintiff claims he is entitled under the Monterey County Hospitality Association Health & Welfare Plan (the "Plan"), which is covered by the Employee Retirement Income Security Act ("ERISA").   Plaintiff seeks coverage for an orthotic device.

    Pursuant to Federal Rule of Civil Procedure 52, each of the parties moves for judgment in its favor on Plaintiff's ERISA claims.  Under Rule 52, the Court conducts a bench trial on the record.  *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999). The parties' filings include Plaintiff's Trial Brief ("Plt. Br.") (ECF No. 201); Defendant UHC's Trial Brief ("UHC

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

Br.") (ECF No. 198); Defendant MAXIMUS's Trial Brief ("MAXIMUS Br.") (ECF No. 199); Plaintiff's Responsive Trial Brief ("Plt. Resp.") (ECF No. 211); Defendant UHC's Responsive Trial Brief ("UHC Resp.") (ECF No. 209); Defendant MAXIMUS's Responsive Trial Brief ("MAXIMUS Resp.") (ECF No. 210), as well as the documents that comprise the record.

The following constitutes the Court's Findings of Fact and Conclusions of Law.  *See* Fed. R. Civ. P. 52.

## I.     APPLICABLE STANDARD OF REVIEW AND REQUEST FOR JUDICIAL NOTICE

Under ERISA § 502, a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 210 (2004) ("[ERISA § 502(a)(1)(B)] is relatively straightforward.  If a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits.").  A claim of denial of benefits in an ERISA case "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 629 (9th Cir. 2009) (explaining that the default standard is de novo).  If the plan confers such discretion, then the denial is reviewed for an abuse of discretion.  *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 110–11 (2008) (explaining that abuse of discretion applies if the terms of the plan provide as much).

Here, the parties each agree that de novo review is the appropriate standard for the Court to employ.  UHC Br. at 6 ("There is no dispute between the parties that this Court will review this case de novo."); MAXIMUS Br. at 3 ("The parties agree that de novo review applies to the first cause of action.").  Accordingly, the Court evaluates Plaintiff's denial of benefits claim in the instant case de novo.  *See Rorabaugh v. Cont'l Cas. Co.*, 321 F. App'x 708, 709 (9th Cir. 2009)

United States District Court
Northern District of California

United States District Court
Northern District of California

1  (holding that the court may accept parties' stipulation to de novo review).

2      A court that employs de novo review in an ERISA case "simply proceeds to evaluate

3  whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health &*

4  *Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006). Generally, the court's review is limited to the

5  evidence contained in the administrative record. *Opeta v. Nw. Airlines Pension Plan for Contract*

6  *Employees*, 484 F.3d 1211, 1217 (9th Cir. 2007) (explaining that in de novo ERISA case,

7  "extrinsic evidence could be considered only under certain limited circumstances"). The Ninth

8  Circuit has explained that the Court may, in its discretion, "allow evidence that was not before the

9  plan administrator." *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938,

10  943–44 (9th Cir. 1995) (internal quotation marks omitted). "The district court should exercise its

11  discretion, however, only when circumstances clearly establish that additional evidence is

12  necessary to conduct an adequate de novo review of the benefit decision." *Id.* at 944 (internal

13  quotation marks omitted). "In most cases," the Ninth Circuit has explained, "where additional

14  evidence is not necessary for adequate review of the benefits decision, the district court should

15  only look at the evidence that was before the plan administrator." *Id.* (internal quotation marks

16  omitted).

17      Here, Plaintiff seeks to introduce full versions of the medical articles that are referenced in

18  the administrative record. The Court will consider those articles as part of the administrative

19  record, as they were presented to both Defendant UHC and Defendant MAXIMUS during the

20  benefit determination. *See* ECF Nos. 202-4, 202-5, 202-6, 202-7, 202-8, 202-9, 202-10, 202-11,

21  202-12, 202-13, 202-14, 202-15, 202-16, 202-17, 202-18, 202-19, 202-20, 202-21; *see also* ECF

22  Nos. 203-1, 203-2. However, Plaintiff and Defendant MAXIMUS also both seek to introduce

23  evidence that is not in the administrative record and that was therefore not before either Defendant

24  UHC or Defendant MAXIMUS in any form. ECF Nos. 200, 202, 203. For the reasons stated

25  below, the Court declines to exercise its discretion to look beyond the administrative record in the

26  instant case.

27      First, Plaintiff seeks to introduce additional secondary literature about the MyoPro Motion

28
Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    G ("MyoPro").  Plt. Br. at 8.  Plaintiff also seeks to introduce previous approvals of the MyoPro

2    by Defendant UHC for third party Medicare recipients, as well as decisions by Administrative

3    Law Judges involving Medicare coverage of the MyoPro.  Plt. Br. at 8.  Finally, Plaintiff seeks to

4    introduce two independent medical reviews in which Defendant MAXIMUS overturned other

5    insurers' denials of coverage of the MyoPro for two patients.  Plt. Br. at 8.  The Court addresses

6    this evidence in turn.

7         First, Plaintiff seeks to introduce three publications to establish the "widespread evidence

8    regarding the acceptance of the MyoPro by the medical community."  *Id.*  The administrative

9    record already contains many medical journal articles that adequately discuss the acceptance of

10   myoelectric technology by the medical community, and the three publications Plaintiff cites do not

11   present new scientific evidence that would affect the outcome of this case or on which the Court

12   need rely in reaching its conclusions.  *See, e.g.*, *Sammons v. Regence Bluecross Blueshield of*

13   *Oregon*, No. 3:15-CV-01703-SI, 2016 WL 1171019, at *8 (D. Or. Mar. 23, 2016), *aff'd*, 739 Fed.

14   Appx. 385 (9th Cir. 2018) (declining to consider article outside the administrative record because

15   "the article does not present new scientific evidence that would affect the outcome of [the

16   plaintiff's] claim determination" and because "[t]his article also repeated the scientific evidence

17   already contained in the administrative record"); *see also Gardner v. Bear Creek Corp.*, No. C 06-

18   02822 MHP, 2007 WL 2318969, at *18 (N.D. Cal. Aug. 6, 2007) (declining to consider articles

19   about thoracic outlet syndrome because "[t]he court does not need to rely on the articles in

20   reaching its conclusion").  Plaintiff therefore fails to clearly establish that consideration of the

21   three publications are necessary for the Court to determine whether the "Unproven Service(s)"

22   exclusion applies to Plaintiff's particular situation.

23        Second, as to the previous approvals by Defendant UHC and the decisions of

24   Administrative Law Judge regarding the MyoPro, "past claims history is not necessary for the

25   Court to conduct an adequate de novo review of [the] benefit decision."  *Hart v. Unum Life Ins.*

26   *Co. of Am.*, 253 F. Supp. 3d 1053, 1069 (N.D. Cal. 2017).  Moreover, these previous decisions add

27   "nothing of material value to the record" because the Court has no visibility into the underlying

28

4

United States District Court
Northern District of California

plan documents and medical conditions present in these decisions. *Id.* Further, although Plaintiff specifically argues that it is significant that Defendant UHC "conceded that the device at issue is no longer considered experimental/investigational and may be covered by Medicare" in a previous proceeding, the "experimental/investigational" exclusion contained within the Plan is not at issue in the instant case. ECF No. 202-23 at 5.

Third, the two previous decisions by Defendant MAXIMUS are irrelevant. The previous approvals cited by Plaintiff involved Cal. Ins. Code § 10169.3, which required Defendant MAXIMUS to "determine whether the disputed health care service was medically necessary based on the specific medical needs of the insured." Cal. Ins. Code § 10169.3. By contrast, the instant case involved Cal. Ins. Code § 10145.3, which required Defendant MAXIMUS to "determine whether the MyoPro "is or is not likely to be more beneficial for the insured than any available standard therapy." ECF Nos. 202-26, 202-27; Cal. Ins. Code § 10145.3. Further, one of the patients in the previous decisions suffered from a different condition than Plaintiff, and the other patient apparently received coverage simply because the insurer failed to provide proper records to Defendant MAXIMUS. ECF Nos. 202-26, 202-27.

Accordingly, as to the foregoing materials, Plaintiff fails to show that "circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision." *Opeta*, 484 F.3d at 1217 (internal quotation marks omitted, emphasis in original).[1]

Defendant MAXIMUS also seeks to introduce evidence outside the administrative record. Specifically, Defendant MAXIMUS seeks to introduce an expert declaration concerning the MyoPro as well as two SEC forms that illustrate Dr. Brandon Green's stock ownership in the company that manufactures the MyoPro. ECF Nos. 210-1, 210-3, 210-4. Defendant MAXIMUS makes no argument that this evidence is necessary for the Court to make a de novo decision, and the Court does not deem it to be necessary. Further, Defendant MAXIMUS seeks judicial notice

---

[1] The Court also disregards the declaration of Dr. Brandon Green to the extent that it discusses these extraneous materials. ECF No. 202.

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

of two websites that describe California's independent medical review process.  The parties' briefing and the administrative record contain sufficient information about the independent medical review process to make judicial notice of these webpages unnecessary to resolve the instant case, however.  Accordingly, as with Plaintiff, Defendant MAXIMUS fails to show that "circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision."  *Opeta*, 484 F.3d at 1217 (internal quotation marks omitted, emphasis in original).

The Court therefore declines to exercise its discretion to consider the foregoing materials in determining whether Defendant UHC and Defendant MAXIMUS wrongfully denied benefits to Plaintiff under ERISA § 502(a)(1)(B).  To the extent Defendant MAXIMUS argues that the material outside the administrative record should be considered exclusively for Plaintiff's claim for breach of fiduciary duty under ERISA § 502(a)(3), such an argument is not well-taken in the instant case for the following reason.  MAX Br. at 2 n.1.  Although consideration of evidence outside the administrative record "may be appropriate for claims under Section 1132(a)(3) that do not arise from the written ERISA plan terms," Plaintiff's breach of fiduciary duty claims do arise from the Plan terms.  *Colaco v. ASIC Advantage Simplified Pension Plan*, 301 F.R.D. 431, 435 (N.D. Cal. 2014).

Indeed, as discussed further *infra*, Plaintiff's breach of fiduciary duty claims overlap with Plaintiff's argument that the benefit determination wrongfully denied benefits under the terms of the Plan.  *See, e.g.*, ECF No. 101 ("Compl.") ¶ 81 (arguing that Defendant UHC and Defendant MAXIMUS breached the duty of care because they "fail[ed] to act in accordance with the documents governing the Plan"); Compl. ¶ 88 (arguing that Defendants UHC and Defendant MAXIMUS breached "their fiduciary duty of loyalty to [Plaintiff] by, among other things, refusing to cover the Myomo MyoPro").

Moreover, equitable relief for breach of fiduciary duty is not "appropriate" where another section of ERISA, such as section 502(a)(1)(B) for wrongful denial of benefits in the instant case, provides an adequate remedy.  *Forsyth v. Humana*, 114 F.3d 1467, 1475 (9th Cir. 1997).  The

1    Court therefore must first assess Plaintiff's claim for wrongful denial of benefits under ERISA §

2    502(a)(1)(B) to determine whether that provision provides Plaintiff with an adequate remedy.  *See,*

3    *e.g.*, *Western v. Unum Life Ins. Co. of Am.*, No. CV 16-9527-JFW (ASx), 2018 WL 6071090, at

4    *11–14 (assessing ERISA § 502(a)(1)(B) claim before turning to ERISA § 502(a)(3) claim).  In

5    the instant case, as outlined *infra*, the Court's resolution of Plaintiff's claims for wrongful denial

6    of benefits under ERISA § 502(a)(1)(B) claims ultimately resolves Plaintiff's claims for breach of

7    fiduciary duty under ERISA § 502(a)(3) as well.  There is therefore no need to expand the

8    administrative record solely for the purposes of Plaintiff's breach of fiduciary duty claims.

9    **II.    FINDINGS OF FACT**

10           The Court makes the following findings of fact as to the structure of Plaintiff's insurance

11   plan, the nature of independent medical review under California law, and the facts surrounding

12   Plaintiff's allegations.

13          **A.   Plaintiff's Insurance Plan.**

14           Plaintiff's employer, Eric Miller Architects, participates in the Monterey County

15   Hospitality Association Health & Welfare Plan (the "Plan").  Pursuant to the Plan's Summary Plan

16   Description, "[b]enefits under the Plan are provided by certain insurance providers contracting

17   with the Trust, and are subject to the provisions of the Plan, the Trust Agreement, your employer's

18   Adoption Agreement, and the determination of the Plan Administrator or health insurance

19   issuer(s)."  UHC 108.[2]  The Plan provides medical benefits through Defendant UHC.  UHC 111–

20   12.

21           Defendant UHC, in turn, promulgates a Certificate of Coverage that "describe[s] []

22   Benefits, as well as [] rights and responsibilities, under the Policy."  UHC 174.  The Certificate of

23   Coverage dictates that Defendant UHC will "pay Benefits for Covered Health Services as

24   described in *Section 1: Covered Health Services* and in the *Schedule of Benefits*, unless the service

25

26   _____

27   [2] Citations to the portion of the administrative record filed by Defendant UHC are notated with the
     word "UHC."  Citations to the portion of the administrative record filed by Defendant MAXIMUS
     are notated with the word "MAX."

28
     Case No. 18-CV-07454-LHK
     FINDINGS OF FACT AND CONCLUSIONS OF LAW

*United States District Court*
*Northern District of California*

is excluded in *Section 2: Exclusions and Limitations*."  UHC 177.  The Certificate of Coverage

outlines various "Covered Health Services."  UHC 180.  In order to qualify as a "Covered Health

Service," a treatment or device must be "Medically Necessary."  *Id.*  The Certificate of Coverage

dictates that "[t]he fact that a Physician or other provider has performed or prescribed a procedure

or treatment, or the fact that it may be the only available treatment for a health condition . . . does

not mean that the procedure or treatment is a Covered Health Service under the Policy."  *Id.*

Instead, "Medically Necessary" is defined by the Certificate of Coverage as follows:

> [H]ealth care services provided for the purpose of preventing, evaluating, diagnosing or treating a health condition, Mental Illness, substance-related and addictive disorders, condition, disease or its symptoms, that are all of the following.

- In accordance with *Generally Accepted Standards of Medical Practice.*

- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for your health condition, Mental Illness, substance-related and addictive disorders, disease or its symptoms.

- Not mainly for your convenience or that of your doctor or other health provider.

- Not more costly than an alternative drug, service(s) or supply that is at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of your health condition, disease or symptoms.

UHC 253.  "Covered Health Services" includes certain types of "durable medical equipment."

UHC 185.  Specifically, "Covered Health Services" includes:

> Durable Medical Equipment that meets each of the following criteria:

- Ordered or provided by a Physician for outpatient use primarily in a home setting.

- Used for medical purposes.

- Not consumable or disposable except as needed for the effective use of covered Durable Medical Equipment.

- Not of use to a person in the absence of a disease or disability.

*Id.*  The Certificate of Coverage further specifies that "[b]enefits under this section do not include

any device, appliance, pump, machine, stimulator, or monitor that is fully implanted into the

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

body." *Id.*

A different section of the Certificate of Coverage outlines "Exclusions and Limitations" from coverage. UHC 203. The exclusions include "Experimental or Investigational and Unproven Services." UHC 206. This exclusion consists of two categories, "Experimental or Investigational Service(s)" and "Unproven Service(s)." UHC 250, 258. The Certificate of Coverage specifically defines both "Experimental or Investigational Service(s)," UHC 250, and "Unproven Service(s)," UHC 258. As to the first category, the Certificate of Coverage defines "Experimental or Investigational Service(s)" as:

> medical, surgical, diagnostic, psychiatric, mental health, substance-related and addictive disorders or other health care services, technologies, supplies, treatments, procedures, drug therapies, medications or devices that, at the time a determination is made regarding coverage in a particular case, are any of the following:

- Not approved by the *U.S. Food and Drug Administration (FDA)* to be lawfully marketed for the proposed use and not identified in the *American Hospital Formulary Service* or the *United States Pharmacoepia Dispensing Information* as appropriate for the proposed use.

- Subject to review and approval by any institutional review board for the proposed use. (Devices which are *FDA* approved under the *Humanitarian Use Device* exemption are not considered to be Experimental or Investigational.)

- The subject of an ongoing clinical trial that meets the definition of a Phase I, II or III clinical trial set forth in the *FDA* regulations, regardless of whether the trial is actually subject to *FDA* oversight.

UHC 250. As to the second category, the Certificate of Coverage defines "Unproven Service(s)" as:

> services, including medications, that are not effective for treatment of the medical condition and/or not to have [sic] a beneficial effect on health outcomes due to insufficient and inadequate clinical evidence from well-conducted randomized clinical trials or cohort studies in the prevailing published peer-reviewed medical literature.

- Well-conducted randomized clinical trials. (Two or more treatments are compared to each other, and the patient is not allowed to choose which treatment is received.)

- Well-conducted cohort studies from more than one institution. (Patients who receive

9

study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.) UHC 258.

The Certificate of Coverage goes on to explain that Defendant UHC has "a process by which we compile and review clinical evidence with respect to certain health services. From time to time, we issue medical and drug policies that describe the clinical evidence available with respect to specific health services. These medical and drug policies are subject to change without prior notice." *Id.*

Specifically, Defendant UHC promulgates a document called the "Omnibus Codes." UHC 353. The Omnibus Codes are a "Medical Policy [that] provides assistance in interpreting [Defendant UHC's] benefit plans." *Id.* However, the Omnibus Codes dictate that "[w]hen deciding coverage, the member specific benefit plan document must be referenced." *Id.* Indeed, the Omnibus Codes state that "[t]he terms of the member specific benefit plan document (e.g., Certificate of Coverage (COC), Schedule of Benefits (SOB), and/or Summary Plan Description (SPD)) may differ greatly from the standard benefit plan upon which this Medical Policy is based." *Id.* The Omnibus Codes also state that "[i]n the event of a conflict, the member specific benefit plan document supersedes this Medical Policy." *Id.*

The Omnibus Codes discuss the "MyoPro myoelectric limb orthosis," the medical device at the center of the instant case. UHC 449. The Omnibus Codes state that "[t]he use of the upper limb orthotic known as the MyoPro orthosis is unproven and not medically necessary due to insufficient clinical evidence and/or efficacy in published peer-reviewed medical literature." *Id.* To justify this conclusion, the Omnibus Codes discuss three separate publications that concluded, *inter alia*, that "[a]dding MyoPro to supervised therapy provided little to no additional benefit"; that "myoelectric bracing may be more beneficial than [repetitive task practice] only in improving self-reported function and perceptions of overall recovery"; and that "therapist supervised task-specific practice with an integrated robotic device could be as efficacious as manual practice in some subjects with moderate upper extremity impairment." *Id.* Defendant UHC also promulgates a "Coverage Determination Guideline" that discusses coverage for "Durable Medical Equipment"

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    such as orthotics and "Prosthetic Devices . . . [and] Myoelectric Limbs."  UHC 339–52.

2        **B.  Independent Medical Review Process.**

3        The Certificate of Coverage provides for an internal appeals process for adverse

4    determinations made by Defendant UHC.  UHC 227.  The Certificate of Coverage also

5    contemplates an "Independent External Review Program."  UHC 229.  Specifically, the Certificate

6    of Coverage explains that "[i]f we deny Benefits because it was determined that the treatment is

7    not Medically Necessary or was an Experimental, Investigational or Unproven Service, you may

8    request an Independent Medical Review (IMR) from the *California Department of Insurance*

9    (*CDI*) at no cost to you."  *Id.*  In order for a beneficiary to take advantage of the independent

10   medical review process, the beneficiary "must first file an appeal of the denial with [Defendant

11   UHC]."  *Id.*  The Certificate of Coverage explains that if Defendant UHC upholds the "decision or

12   delay[s] responding to your appeal/grievance, then you may file a Request for Assistance or an

13   [Independent Medical Review] request with the California Department of Insurance."  *Id.*

14       The Certificate of Coverage dictates that an independent medical review may be requested

15   for only certain types of denials.  *Id.*  Of relevance here, the Certificate of Coverage explains that

16   independent medical review may be requested for "[h]ealth claims that have been denied as being

17   Experimental, Investigational or Unproven Services."  *Id.*

18       The Certificate of Coverage indicates that in an independent medical review, "expert

19   independent medical professional[s] review the medical decisions made by [Defendant UHC] and

20   often decide in favor of the Covered Person getting the medical treatment requested."  *Id.*  Further,

21   the Certificate of Coverage states that "[t]he decision [that results from the independent medical

22   review] is binding on [Defendant UHC]."  UHC 230.

23       The California Department of Insurance contracts with third-party entities to perform the

24   independent medical reviews contemplated by the Certificate of Coverage.  MAX 1.  Defendant

25   MAXIMUS is one such entity.  *Id.*  Independent medical reviewers like Defendant MAXIMUS

26   are statutorily authorized to review certain insurer decisions regarding "whether [a] disputed

27   health care service was medically necessary," Cal. Ins. Code § 10169.3(b), as well as "decision[s]

28

11

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

to deny, delay, or modify experimental or investigational therapies," Cal. Ins. Code § 10145.3(b).
When the California Department of Insurance receives a request for an independent medical
review, the California Department of Insurance determines whether the underlying decision is
eligible for independent medical review under one of these two categories.  UHC 229.

When an independent medical reviewer such as Defendant MAXIMUS performs a review
of an insurer's "decision to deny, delay, or modify experimental or investigational therapies," Cal.
Ins. § 10145.3(b), California law sets out requirements for how the review is conducted.  Of
relevance here, pursuant to California law, independent medical reviewers must provide "the
reasons the requested therapy is or is not likely to be more beneficial for the insured than any
available standard therapy, and the reasons that the expert recommends that the therapy should or
should not be covered by the insurer, citing the insured's specific medical condition, the relevant
documents, and the relevant medical and scientific evidence, including, but not limited to, the
medical and scientific evidence as defined in subdivision (d), to support the expert's
recommendation."  Cal. Ins. Code § 10145.3(c)(3).  Defendant MAXIMUS's review is confined to
this question, and Defendant MAXIMUS does not determine whether any particular provision of
the Plan entitles an insured to coverage of a benefit.

Moreover, California law sets forth the materials that independent medical reviewers like
Defendant MAXIMUS must consider.  Cal. Ins. Code § 10145.3(b).  Those materials include,
with certain further qualifications not relevant to the instant case: (1) "[p]eer-reviewed scientific
studies published in or accepted for publication by medical journals"; (2) "[p]eer-reviewed
literature, biomedical compendia and other medical literature"; (3) "[m]edical journals recognized
by the Secretary of Health and Human Services"; (4) numerous "reference compendia"; (5)
"[f]indings, studies, or research conducted by or under the auspices of federal government
agencies and nationally recognized federal research institutes"; and (6) "[p]eer-reviewed abstracts
accepted for presentation at major medical association meetings."  Cal. Ins. Code § 10145.3(d).

**C. Plaintiff's Request for Coverage of the MyoPro.**

In 2002, Plaintiff was involved in a vehicular accident that rendered Plaintiff's left arm

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   weakened and numb.  UHC 41.  The medical name for Plaintiff's condition is brachial plexopathy,

2   and the condition arises from a lower motor neuron injury.  UHC 78; MAX 8.  On July 5, 2017,

3   Plaintiff was examined by his doctor, Dr. Ken Hashimoto, who assessed Plaintiff and discussed a

4   possible referral for a myoelectric orthotic manufactured by Myomo, Inc. ("Myomo").  UHC 48.

5   Specifically, Myomo manufactures a myoelectric elbow-wrist-hand orthosis known as the MyoPro

6   Motion G ("MyoPro").  UHC 43–44.  The MyoPro orthosis works by detecting a patient's

7   neurological signals through sensors placed on the arm, in order to amplify a patient's weak neural

8   signal to help move the limb.  *Id.*

9       Dr. Ken Hashimoto referred Plaintiff to the Valley Institute of Prosthetics and Orthotics

10   for further evaluation by certified prosthetists and orthotists.  UHC 41, 48.  The Valley Institute of

11   Prosthetics and Orthotics determined that Plaintiff met the criteria to use a myoelectric orthosis.

12   UHC 41.

13       On September 19, 2017, Dr. Brandon Green, a physician consultant for the Valley Institute

14   of Prosthetics and the Chief Medical Officer of Myomo, submitted a request for coverage of the

15   MyoPro for use by Plaintiff to Defendant UHC.  UHC 41.  As part of the submission, Dr. Green

16   prepared a history and physical exam review of Plaintiff and his condition.  UHC 41–44.  Dr.

17   Green opined that a myoelectric orthosis is the "best available technology" to help provide

18   functionality to Plaintiff's left arm.  *Id.*  Dr. Green explained that Plaintiff had undertaken

19   numerous other treatments that had not restored Plaintiff's left arm function.  *Id.*  Moreover, Dr.

20   Green asserted that "there is a wealth of well-designed, peer-reviewed, published studies over the

21   course of six decades which prove the standardized clinical efficacy and superiority of robotic,

22   myoelectric technology over traditional, less sophisticated treatment alternatives for neurological

23   impairments such as [that of Plaintiff]."  *Id.*  Dr. Green cited eighteen publications in connection

24   with the history and physical exam review.  *Id.*

25       Importantly, Dr. Green also explained that Plaintiff sought to "incorporate a myoelectric

26   orthosis into his daily life."  UHC 41.  In other words, Plaintiff wished to use the MyoPro long-

27   term, "in all aspects of his daily life," "from cooking and feeding himself at home, to working

28

13

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

around the house and preparing drawings on the computer for work." UHC 44.

In correspondence dated October 10, 2017, Defendant UHC denied Plaintiff's request for coverage of the MyoPro orthotic. UHC 35. As rationale for the decision, Defendant UHC stated the following: "Here is the specific clinical reason for our decision. We have received a request for a new artificial arm for you. You had an injury to the nerves of the arm. We reviewed the information received. We reviewed your benefit plan's document. We reviewed your health plan's medical policy for artificial limbs. This request does not meet your health plan's coverage criteria. The code submitted is incorrect and a more specific code should be provided. Your health plan covers only the most cost effective equipment to meet your needs. This request may not be the most cost effective one. Thus this request is not covered under your health plan." UHC 36. Defendant UHC informed Plaintiff of Plaintiff's right to an internal appeal, as well as Plaintiff's opportunity to seek an independent medical review in the event that the internal appeal was denied. UHC 36–38. Defendant UHC also indicated that the denial was based in part on Defendant UHC's written policy on "Durable Medical Equipment," as well as Defendant UHC's written policy on "Prosthetic Devices." UHC 35.

### D. Plaintiff's Appeal with Defendant UHC.

On November 22, 2017, Dr. Green filed an appeal of Defendant UHC's denial of benefits to Defendant UHC's Appeals Unit. UHC 31. Dr. Green argued that the "Prosthetic Devices" policy was inapplicable to Plaintiff's request for coverage of the MyoPro. UHC 32. Dr. Green also argued that the MyoPro met each of the requirements outlined in Defendant UHC's written policy on "Durable Medical Equipment." *Id.* Finally, Dr. Brandon Green informed Defendant UHC that the coverage request had in fact been submitted with the correct code. *Id.*

On December 11, 2017, Defendant UHC denied Plaintiff's appeal. UHC 74. Specifically, in a letter to Plaintiff, Defendant UHC stated as follows: "The request to cover a device (MYOPRO) for you was reviewed. We looked at the notes sent to us. We looked at your health plan benefits. The notes show that you have arm weakness (brachial plexopathy). The requested device has not been shown to help your condition. It cannot be covered. The denial is upheld."

14

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    UHC 78.  Defendant UHC cited numerous provisions from the Certificate of Coverage, including

2    the Certificate of Coverage's definition of "Medically Necessary" as well as the Certificate of

3    Coverage's exclusion for "Experimental or Investigational and Unproven Services."  UHC 76.

4    Defendant UHC also indicated that the decision was based in part on Defendant UHC's Omnibus

5    Codes, along with Defendant UHC's written policies on "Prosthetic Devices" and "Durable

6    Medical Equipment."  UHC 78.  Defendant UHC also advised Plaintiff that Plaintiff had

7    exhausted the internal appeal process, and that Plaintiff had the right to an independent medical

8    review through the California Department of Insurance.  UHC 79.

9        **E. Plaintiff's Independent Medical Review with Defendant MAXIMUS.**

10            Shortly after the denial of benefits by Defendant UHC's Appeals Unit, on December 11,

11   2017, Plaintiff filed a request for an independent medical review with the California Department

12   of Insurance.  MAX 18.  On January 26, 2018, Dr. Brandon Green filed a letter in support of

13   Plaintiff's independent medical review application, along with supporting documentation.  MAX

14   550.  In the letter, Dr. Brandon Green criticized the three publications that were cited by

15   Defendant UHC's Omnibus Codes to support Defendant UHC's noncoverage of the MyoPro.

16   MAX 552.  Dr. Brandon Green also enclosed two previous determinations by Defendant

17   MAXIMUS in January and September 2017 that the MyoPro was "likely to be more beneficial for

18   treatment of [a particular patient's] medical condition than any available standard therapy."  MAX

19   610, 619.

20            Defendant MAXIMUS conducted the independent medical review, and the review was

21   conducted by "three independent physician consultants who have no affiliation with" Defendant

22   UHC.  MAX 2.  Each of the three reviewers employed by Defendant MAXIMUS received copies

23   of Plaintiff's medical records, the letters of Dr. Brandon Green, the Certificate of Coverage, and

24   several of Defendant UHC's medical policies.  MAX 4–12.  In Defendant MAXIMUS's final

25   report, Defendant MAXIMUS then certified that the reviewers "examined all of the medical

26   records and documentation submitted" to reach their conclusions.  MAX 2.  Each of the reviewers

27   also "performed a search of the relevant medical literature" and relied on additional publications

28

United States District Court
Northern District of California

15

1  generated by the search.  MAX 4–12.  Each reviewer concluded that "the requested equipment is

2  not likely to be more beneficial for treatment of the [Plaintiff's] medical condition than any

3  available standard therapy."  MAX 2.  Accordingly, Defendant MAXIMUS declared that

4  Defendant UHC's "denial has been upheld."  *Id.*  Defendant MAXIMUS informed Plaintiff that

5  Plaintiff "cannot appeal this decision.  The Department of Insurance does not accept appeals of a

6  MAXIMUS decision.  The decision of MAXIMUS is final."  *Id.*

7  **III.    CONCLUSIONS OF LAW**

8          Plaintiff brings two claims against Defendants UHC and MAXIMUS.  First, Plaintiff

9  brings a claim for wrongful denial of benefits under ERISA § 502(a)(1)(B).  Second, Plaintiff

10 brings a claim for breach of fiduciary duty under ERISA § 502(a)(3).  The Court begins with the

11 claim for wrongful denial of benefits under ERISA § 502(a)(1)(B) and then turns to Plaintiff's

12 claim for breach of fiduciary duty under ERISA § 502(a)(3).

13     **A.    Wrongful Denial of Benefits under ERISA § 502(a)(1)(B).**

14         Plaintiff argues that Plaintiff is entitled to preauthorization of the MyoPro under the terms

15 of the Plan.  Compl. ¶ 74.  Accordingly, Plaintiff brings a claim against both Defendants UHC and

16 MAXIMUS under ERISA § 502(a)(1)(B).  The Court considers this claim against each of the

17 Defendants in turn.

18         **1.    Defendant UHC Is Liable under ERISA § 502(a)(1)(B) Because the MyoPro Is Not
               Subject to the Plan's "Unproven Service(s)" Exclusion.**

19

20         As to Defendant UHC, Plaintiff argues that the MyoPro qualifies for the definition of

21 "Covered Health Service" under the Certificate of Coverage.  Plt. Br. at 8–9.  Defendant UHC

22 does not argue otherwise.  Instead, Defendant UHC contends that the "Unproven Service(s)"

23 exclusion applies.  The Certificate of Coverage defines "Unproven Service(s)" as:

24         Services, including medications, that are not effective for treatment of the medical
           condition and/or not to have [*sic*] a beneficial effect on health outcomes due to
25         insufficient and inadequate clinical evidence from well-conducted randomized
           clinical trials or cohort studies in the prevailing published peer-reviewed medical
26         literature.

27     •    Well-conducted randomized clinical trials.  (Two or more treatments are compared

28                                                    16

1

to each other, and the patient is not allowed to choose which treatment is received.)

2

3

• Well-conducted cohort studies from more than one institution. (Patients who receive study treatment are compared to a group of patients who receive standard therapy. The comparison group must be nearly identical to the study treatment group.)

4

UHC 258.  In an ERISA case that involves de novo review, the general rule is that the plaintiff

5

bears the burden of demonstrating that a benefit is covered.  *See Muniz v. Amec Const. Mgmt.,*

6

*Inc.*, 623 F.3d 1290, 1294 (9th Cir. 2010) ("[W]hen the court reviews a plan administrator's

7

decision under the de novo standard of review, the burden of proof is placed on the claimant.").

8

However, because the question before the Court is the applicability of an exclusion of

9

coverage, the burden of proof in fact rests with Defendant UHC to show that the "Unproven

10

Service(s)" exclusion applies, as Defendant UHC concedes.  *See Intel Corp. v. Hartford Acc. &*

11

*Indem. Co.*, 952 F.2d 1551, 1557 (9th Cir. 1991) ("In insurance litigation, while the burden is on

12

the insurer to prove a claim covered falls within an exclusion, the burden is on the insured initially

13

to prove that an event is a claim within the scope of the basic coverage." (internal quotation

14

omitted)); *see also Dubaich v. Connecticut Gen. Life Ins. Co.*, No. CV 11–10570 DMG (AJWx),

15

2013 WL 3946108, at *9 (C.D. Cal. July 31, 2013) ("[Defendant] bears the burden of

16

demonstrating that an exclusion applies."); UHC Br. at 6 ("However, since the issue here is the

17

applicability of an exclusion of coverage, United has the burden of proof to demonstrate that the

18

'Unproven Service(s)' provision applies.").  The burden of proof is preponderance of evidence.

19

*See, e.g., Filarsky v. Life Ins. Co. of N.A.*, 391 F. Supp. 3d 928, 938 (N.D. Cal. 2019) (applying

20

preponderance of evidence on ERISA case in de novo review).  Moreover, "[u]nder general

21

principles of insurance law, exclusions are construed narrowly."  *Dowdy v. Met. Life Ins. Co.*, 890

22

F.3d 802, 810 (9th Cir. 2018).

23

First, the Court addresses the meaning of the "Unproven Service(s)" exclusion.  As an

24

initial matter, the "Unproven Service(s)" exclusion contained within the Certificate of Coverage

25

appears to contain a typographical error.  Indeed, the Certificate of Coverage indicates that the

26

"Unproven Service(s)" provision applies to "services, including medications, that are not effective

27

for treatment of the medical condition and/or not to have a beneficial effect on health outcomes

28

United States District Court
Northern District of California

1    due to insufficient and inadequate clinical evidence from well-conducted randomized controlled

2    trials or cohort studies in the prevailing published peer-reviewed medical literature."  UHC 258.

3         The version of this exclusion that was repeatedly quoted to Plaintiff contained different

4    language.  Specifically, the version of the exclusion that was quoted to Plaintiff said that the

5    provision applies to "services, including medications, that are *determined* not *to be* effective for

6    treatment of the medical condition and/or not to have a beneficial effect on health outcomes due to

7    insufficient and inadequate clinical evidence from well-conducted randomized controlled trials or

8    cohort studies in the prevailing published peer-reviewed medical literature."  UHC 78 (emphasis

9    added).

10        As the Court did with respect to the motions for summary judgment, the Court assumes

11   that there is no material difference between these two formulations.  Even in the corrected version

12   of the provision, however, the language of the "Unproven Service(s)" exclusion is far from a

13   model of clarity.

14        As an initial matter, the "and/or" is ambiguous.  Whether the requirement is conjunctive or

15   disjunctive affects the scope of the exclusion.  Because the Court must resolve any ambiguities in

16   favor of Plaintiff, and because exclusions in insurance plans are construed narrowly, the Court

17   concludes that in order for the exclusion to apply, the MyoPro must be "determined not to be

18   effective and not to have a beneficial effect on health outcomes due to insufficient and inadequate

19   clinical evidence from well-conducted randomized controlled trials or cohort studies in the

20   prevailing published peer-reviewed medical literature."  *See, e.g.*, *O'Neal v. Life Ins. Co. of North*

21   *America*, 10 F. Supp. 3d 1132, 1136 (D. Mont. 2014) ("Terms that are not defined by the plan

22   (and other ambiguities) are to be construed against the drafter of the plan.").

23        A further difficulty arises from the fact that the "Unproven Service(s)" exclusion applies

24   when a treatment is **determined to be not effective** and not to have a beneficial effect on health

25   outcomes based on insufficient and inadequate clinical evidence.  This is subtly different from an

26   exclusion that would apply when a treatment is **not determined to be effective** based on lack of

27   clinical evidence.

28

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1      The Court construes the "Unproven Service(s)" exclusion to apply only when the outcome

2  of qualifying studies affirmatively suggest that a treatment is ineffective and does not have a

3  beneficial impact on health outcomes.  As the Court noted on summary judgment, this is a higher

4  threshold than mere absence of evidence; by its terms, the exclusion instead requires the actual

5  existence of evidence of ineffectiveness and lack of impact.  This result is compelled by the

6  principles of ERISA, which require the Court to construe exclusions narrowly, enforce Plan terms

7  as written, and resolve ambiguities against the drafter.  *See Heimseshoff*, 571 U.S. at 108

8  (explaining that ERISA terms should generally be enforced as written); *Dowdy v. Metro. Life Ins.*

9  *Co.*, 890 F.3d 802, 810 (9th Cir. 2018) ("Under general principles of insurance law, exclusions are

10  construed narrowly."); *O'Neal v. Life Ins. Co. of North America*, 10 F. Supp. 3d at 1136 ("Terms

11  that are not defined by the plan (and other ambiguities) are to be construed against the drafter of

12  the plan.").

13      The Court must now determine whether Defendant UHC has met its burden of proving by

14  a preponderance of evidence that the exclusion applies.  *See Dubaich*, 2013 WL 3946108, at *9

15  ("[Defendant] bears the burden of demonstrating that an exclusion applies."); UHC Br. at 6

16  ("However, since the issue here is the applicability of an exclusion of coverage, United has the

17  burden of proof to demonstrate that the 'Unproven Service(s)' provision applies."); *Filarsky*, 391

18  F. Supp. 3d at 938 (applying preponderance of evidence on ERISA case in de novo review).  The

19  Court answers this question in the negative.

20      Defendant UHC cites two sources to argue that the "Unproven Service(s)" exclusion

21  applies.  First, Defendant UHC points to the Omnibus Codes.  Under the Omnibus Codes, "[t]he

22  use of the upper limb orthotic known as the MyoPro orthosis is unproven and not medically

23  necessary due to insufficient clinical evidence and/or efficacy in published peer-reviewed medical

24  literature."  UHC 449.  As the Court previously explained, the Omnibus Codes do not represent

25  part of the Plan.  Indeed, the Certificate of Coverage describes the Omnibus Codes as follows:

26  "We have a process by which we compile and review clinical evidence with respect to certain

27  health services.  From time to time, we issue medical and drug policies that describe the clinical

28
19

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    evidence available with respect to specific health care services.  These medical and drug policies

2    are subject to change without prior notice."  UHC 258.

3          Accordingly, by the terms of the Certificate of Coverage, the Omnibus Codes are only

4    meant to "describe the clinical evidence available" as to a particular service.  *Id.*  Further, the

5    Omnibus Codes themselves do not constitute binding terms of the Plan.  The Omnibus Codes

6    represent a "Medical Policy [that] provides assistance in interpreting [Defendant UHC's] benefit

7    plans."  UHC 353.  The Omnibus Codes dictate that "[w]hen deciding coverage, the member

8    specific benefit plan document must be referenced."  *Id.*  Indeed, the Omnibus Codes state that

9    "[t]he terms of the member specific benefit plan document (e.g., Certificate of Coverage (COC),

10   Schedule of Benefits (SOB), and/or Summary Plan Description (SPD)) may differ greatly from the

11   standard benefit plan upon which this Medical Policy is based."  *Id.*  The Omnibus Codes also

12   state that "[i]n the event of a conflict, the member specific benefit plan document supersedes this

13   Medical Policy."  *Id.*

14         The Omnibus Codes cite and discuss clinical evidence that could plausibly support the

15   application of the exclusion, however.  Specifically, the Omnibus Codes survey three publications

16   that are purportedly relevant to Plaintiff's use of the MyoPro.  The first publication, an April 2017

17   ECRI Health Technology Assessment, examined four studies and one conference abstract that

18   collectively involved 91 stroke victims.  UHC 449.  The publication concluded that the "MyoPro

19   alone improved activities of daily living as much as supervised therapy alone in the short term for

20   some stroke patients."  *Id.*  However, "[a]dding MyoPro to supervised therapy provided little to no

21   additional benefit."  *Id.*  The first publication noted that "[a]dditional controlled studies are needed

22   to confirm these results, provide longer-term results, and to study different patient populations."

23   *Id.*

24         The second publication is an article entitled *Portable Myoelectric Brace Use Increases*

25   *Upper Extremity Recovery and Participation but Does Not Impact Kinematics in Chronic,*

26   *Poststroke Hemiparesis*, 49:1 J. Mot. Behav. 46–54 (2017).  UHC 450.  This second publication

27   examined twelve stroke patients and concluded that "integrating myoelectric bracing may be more

28

United States District Court
Northern District of California

1  beneficial than [repetitive task-specific practice] only in improving self-reported function and

2  perceptions of overall recovery." *Id.*

3        Finally, the Omnibus Codes cite a third publication entitled *Portable Upper Extremity*

4  *Robotics Is as Efficacious as Upper Extremity Rehabilitative Therapy*, 27(6) Clin. Rehabil. 494–

5  503 (2013).  This third publication examined sixteen stroke patients.  *Id.*  The third publication

6  concluded that "therapist supervised task-specific practice with an integrated robotic device could

7  be as efficacious as manual practice in some subjects with moderate upper extremity impairment."

8  *Id.*

9        Notwithstanding the conclusion reached by the Omnibus Codes that the studies show that

10  the MyoPro is "unproven" as to Plaintiff, these studies fail to provide affirmative evidence that the

11  MyoPro is "not . . . effective" and would not "have a beneficial effect on health outcomes" for

12  Plaintiff.  First, each of the three studies cited by the Omnibus Codes examined the impact of

13  myoelectric orthotics on stroke victims, but Plaintiff is not a stroke victim.  Plaintiff has a brachial

14  plexus injury, which comprises a lower motor neuron injury, not an upper motor neuron injury

15  caused by a stroke.  UHC 78.

16        Second, each of the three studies examined the impact of myoelectric orthotics on

17  rehabilitation, but this is not Plaintiff's intended use.  The record makes clear that Plaintiff does

18  not seek to use the MyoPro "as a traditional rehab tool."  MAX 552.  Instead, Plaintiff seeks the

19  MyoPro to restore functional capacity.  Importantly, as noted, Plaintiff wishes to use the MyoPro

20  for long term, permanent use "in all aspects of his daily life," "from cooking and feeding himself

21  at home, to working around the house and preparing drawings on the computer for work."  UHC

22  44.  None of the studies cited in the Omnibus Codes discuss the effectiveness of such a use.

23        Third, to the extent that the three studies can be said to have reached negative conclusions

24  about the MyoPro, the studies reached those conclusions only insofar as they reasoned that the

25  MyoPro is not more effective than existing treatments.  Specifically, the first and second studies

26  concluded that the "MyoPro alone improved activities of daily living as much as supervised

27  therapy alone in the short term for some stroke patients," UHC 449, and that "integrating

28

Northern District of California
United States District Court

21

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

myoelectric bracing may be more beneficial than [repetitive task-specific practice] only in improving self-reported function and perceptions of overall recovery," UHC 450.  However, the "Unproven Service(s)" exclusion does not apply when a treatment is only as effective as existing treatments, or even when a treatment is less effective than other treatments.  Instead, the "Unproven Service(s)" exclusion simply requires that a treatment be determined "not to be effective" and/or "not to have a beneficial effect on health outcomes."  UHC 78.  Under any reasonable reading, the studies in the Omnibus Codes do not show by a preponderance of evidence that the MyoPro may be determined "not to be effective" and "not to have a beneficial effect on health outcomes" for Plaintiff.

Defendant UHC also cites the determinations by the three independent medical reviewers in the instant case.  However, as further outlined *infra*, the conclusions of the independent medical reviewers do not support the application of the "Unproven Service(s)" exclusion.  This is so because the independent medical reviewers employed by Defendant MAXIMUS resolved a different question.  Each of the independent medical reviewers surveyed the literature and concluded "that the requested equipment is not likely to be more beneficial for treatment of the enrollee's medical condition than any available standard therapy."  MAX 2.  Unlike this standard, the "Unproven Service(s)" exclusion requires affirmative evidence that a treatment has been determined "not to be effective" and "not to have a beneficial effect on health outcomes," based on the appropriate clinical studies.  UHC 78.

Accordingly, the Court concludes that the "Unproven Service(s)" exclusion does not bar coverage of the MyoPro for Plaintiff.  The Court therefore finds that Defendant UHC improperly denied coverage of the MyoPro.  The Court must next examine Plaintiff's ERISA § 502(a)(1)(B) claim against Defendant MAXIMUS.

### 2.  Defendant MAXIMUS Is Not Liable under ERISA § 502(a)(1)(B) Because Defendant MAXIMUS's Determination Was Correct.

The parties also dispute whether Defendant MAXIMUS is also liable under ERISA § 502(a)(1)(B).  The inquiry into Defendant MAXIMUS's liability is different from that of

22

1      Defendant UHC, however, because Defendant MAXIMUS did not apply the terms of the Plan.

2             In *Spinedex Physical Therapy USA Inc. v. United Healthcare of Arizona*, 770 F.3d 1282

3      (9th Cir. 2014), the Ninth Circuit provided guidance as to which parties constitute proper

4      defendants for actions for improper denial of benefits under ERISA § 502(a)(1)(B).  In *Spinedex*,

5      the Ninth Circuit explained that "proper defendants under § 1132(a)(1)(B) for improper denial of

6      benefits at least include ERISA plans, formally designated plan administrators, insurers or other

7      entities responsible for payment of benefits, and de facto plan administrators that improperly deny

8      or cause improper denial of benefits."  *Id.* at 1297.  Importantly, the Ninth Circuit has held that

9      entities other than ERISA plans may be sued under ERISA § 502(a)(1)(B) only "as long as that

10     party's *individual liability* is established."  *Cyr v. Reliance Standard Life Ins. Co.*, 642 F.3d 1202,

11     1207 (9th Cir. 2011) (en banc) (emphasis added).  Accordingly, the Court must determine whether

12     Defendant MAXIMUS is individually liable for denial of benefits under the Plan.

13            This requires a determination of whether Defendant MAXIMUS wrongly concluded that

14     the MyoPro was "not likely to be more beneficial for treatment of [Plaintiff's] medical condition

15     than any available standard therapy."  MAX 2.  As an initial matter, and as Defendant MAXIMUS

16     correctly notes, this determination is very different from the determination of whether the

17     "Unproven Service(s)" provision in the Plan applies to Plaintiff.  MAX Br. at 8 ("The outcome of

18     the IMR did not turn on the language of the Certificate of Coverage.").  Defendant MAXIMUS

19     did not make a determination about coverage.  Instead, Defendant MAXIMUS made a factual

20     determination required by California law, which was triggered by Defendant UHC's denial.  Cal.

21     Ins. Code § 10145.3(a)(3) ("Each expert's analysis and recommendation shall be in written form

22     and state the reasons the requested therapy is or is not likely to be more beneficial for the insured

23     than any available standard therapy . . . .").

24            This affects the threshold question of burden of proof.  Plaintiff contends that the burden of

25     proof falls on Defendant MAXIMUS because Defendant MAXIMUS's review was triggered by

26     the fact that Defendant UHC determined that the MyoPro was an "Unproven Service[]."  UHC

27     229.  For the sake of the instant case, the Court assumes that Plaintiff is correct, as the burden of

28
Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

proof does not affect the outcome of this issue.

In order for Defendant MAXIMUS to prevail on this claim, Defendant MAXIMUS must show by a preponderance of evidence that the MyoPro was "not likely to be more beneficial for treatment of [Plaintiff's] medical condition than any available standard therapy." MAX 2. By its own terms, and in contrast from the "Unproven Service(s)" exclusion in the Plan, this standard merely requires Defendant MAXIMUS to show that there is an absence of evidence that the MyoPro is "likely to be more beneficial" than any available standard therapy for Plaintiff.

As an initial matter, the Court notes that Plaintiff does not seek to use the MyoPro "as a traditional rehab tool." MAX 552. Instead, Plaintiff seeks the MyoPro to restore functional capacity. Indeed, Plaintiff wishes to use the MyoPro "in all aspects of his daily life," "from cooking and feeding himself at home, to working around the house and preparing drawings on the computer for work." UHC 44. Plaintiff also seeks to use the device long-term, "for at least 5 years." *Id.* Plaintiff also suffers from a brachial plexus injury, and Plaintiff is not a stroke victim like most users of the MyoPro reflected in the administrative record. UHC 41. Thus, as outlined below, the combination of these facts means that there is insufficient evidence that Plaintiff's contemplated use of the MyoPro is "likely to be more beneficial" than any available standard therapy.

As an initial matter, all three of the independent medical reviewers reached this conclusion. Each of the independent medical reviewers stressed the seeming novelty of the MyoPro for Plaintiff's long-term, functional use. Physician #1 pointed to numerous uncertainties, such as a concern that "[i]t is not well known whether the users will adopt the device for regular functional use in the long term or if the device itself will cause injuries with long term use (e.g., at the shoulder due to the equipment's weight)." MAX 6. Physician #1 also claimed that "[f]urther study is required to determine [the MyoPro's] efficacy and safety when compared to standard means of treatment." *Id.*

Physician #2 focused on the nature of Plaintiff's injury. Physician #2 noted that "[t]here are a few studies showing the myoelectric orthosis can be beneficial when applied to patients with

United States District Court
Northern District of California

upper motor neuron pathology such as stroke." MAX 8. However, Physician #2 explained that Plaintiff "has a brachial plexus lesion with monoplegia and it is undetermined whether a myoelectric device would be of benefit in the long run with such a severe lower motor neuron injury." *Id.* Hence, Physician #2 stated that "[i]n this patient's case, there is a lack of evidence[] based literature supporting the efficacy of the requested device." *Id.*

Physician #3 also explained that "[t]here is very limited support in the literature as to the superior effectiveness" of the MyoPro for Plaintiff. MAX 11. For instance, Physician #3 quoted a medical journal article that examined a procedure that utilized a myoelectric prosthesis and concluded that long term follow-up was required in order to accurately assess the benefits of the prosthesis. MAX 11–12.

Plaintiff argues that the foregoing conclusions were incorrect. As an initial matter, Plaintiff argues that the independent medical reviewers lack credibility because they work for a "for-profit IRO [i.e., independent review organization]," namely Defendant MAXIMUS. Plt. Br. at 8. However, California law imposes rigorous conflict-of-interest requirements on independent medical organizations like Defendant MAXIMUS and on the independent medical reviewers employed by Defendant MAXIMUS. For instance, among many other requirements imposed by California law, the independent medical reviewers cannot "have any material professional, familial, or financial affiliation" with the individuals or entities involved in the underlying insurance determination. Cal. Ins. Code § 10169.2(c). In order to contract with the California Department of Insurance, Defendant MAXIMUS was also statutorily required to demonstrate that Defendant MAXIMUS "[e]nsures the independence of the medical professionals retained to perform the reviews through conflict-of-interest policies and prohibitions, and ensures adequate screening for conflicts of interest." Cal. Ins. Code § 10169.2(d)(3)(E).

Further, medical professionals employed as independent medical reviewers must be "clinician expert[s] in the treatment of the insured's medical condition and knowledgeable about the proposed treatment through recent or current actual clinical experience treating patients with the same or a similar medical condition as the insured." Cal. Ins. Code § 10169.2(d)(4)(A). In

25

United States District Court
Northern District of California

line with this requirement, all three independent medical reviewers in the instant case indicated that they were "board certified in physical medicine and rehabilitation," "actively practicing," an "expert in the treatment of [Plaintiff's] medical condition and knowledgeable about the [MyoPro] through recent or current actual clinical experience treating those with the same or a similar medical condition. MAX 4; MAX 7; MAX 10.  None of the three independent medical reviewers has "any history of disciplinary action."  MAX 4; MAX 7; MAX 10.  The Court finds the independent medical reviewers' assessments of the relevant literature to be highly credible.

Dr. Green, on the other hand, argued that "permanent, daily use" of the MyoPro would be beneficial for Plaintiff.  UHC 43.  Dr. Green serves as the Chief Medical Officer of Myomo, the manufacturer of the MyoPro.  UHC 44.  Because of Dr. Green's position, Dr. Green's testimony as to the likelihood of benefit from the use of the MyoPro "in all aspects of [Plaintiff's] daily life" is profoundly less credible than that of the independent medical reviewers, none of whom possess a direct financial interest in the success of the MyoPro.

Dr. Green argued that "[o]ver 400 myoelectric upper extremity orthoses have been approved for permanent, daily use to restore paretic arms since 2006 by numerous payers."  UHC 43.  However, even crediting this statement, Dr. Green's assertion says nothing about the medical conditions of the recipients or whether the use was long-term, as contemplated for Plaintiff.

Dr. Green also cited two previous independent medical reviews performed by Defendant MAXIMUS.  In those independent medical reviews, Defendant MAXIMUS overturned insurers' decisions not to cover the MyoPro because two of the three independent medical reviewers deemed the MyoPro to be more beneficial for the relevant patients than any standard treatment. MAX 616–26.  This evidence has minimal weight in the instant case, however, because the Court has almost no insight into the specific circumstances of the two previous patients.  Each of the independent medical reviewers in those cases based their decisions on the medical records of the patients.  For instance, one independent medical reviewer stated that the MyoPro "is to assist in upper extremity function for an individual with weakness but not paralysis of the upper limb." MAX 625.  Yet Plaintiff's medical records indicate that Plaintiff suffers from "[p]aralysis of L

26

United States District Court
Northern District of California

1   upper extremity," UHC 48–49, and Dr. Green repeatedly characterized Plaintiff as "functionally

2   equivalent to a left above elbow amputee," UHC 42.  Another independent medical reviewer noted

3   that one of the patients "underwent tendon transfer surgeries [that] have resulted in the

4   physiological equivalent of an incomplete motor neuron lesion," which made it more likely that

5   the MyoPro would be useful for that patient.  MAX 616.  Plaintiff has undergone no such

6   procedures.  Accordingly, the previous independent medical reviews possess minimal weight.

7       Next, Dr. Green cited eighteen articles from medical journals that examine myoelectric

8   orthotics.  However, none of these articles shows that the MyoPro is "likely to be beneficial" for

9   Plaintiff.  First, thirteen of the eighteen articles examined the effect of the MyoPro on stroke

10   victims.  ECF Nos. 202-5, 202-7, 202-9, 202-10, 202-11, 202-12, 202-13, 202-14, 202-15, 202-16,

11   202-17, 202-18, 202-19.  However, as Physician #2 explained, Plaintiff is not a stroke victim.

12   Instead, Plaintiff "has a brachial plexus lesion with monoplegia and it is undetermined whether a

13   myoelectric device would be of benefit in the long run with such a severe lower motor neuron

14   injury."  MAX 8.  The use of the MyoPro by stroke victims does not show that the MyoPro is

15   likely to be effective for Plaintiff.

16       Second, twelve of the eighteen studies examined the effectiveness of the MyoPro for

17   rehabilitation.  ECF Nos. 202-9, 202-10, 202-11, 202-13, 202-14, 202-15, 202-16, 202-17, 202-18,

18   202-19, 202-20, 202-18, 202-21.  However, the record makes clear that Plaintiff does not seek to

19   use the MyoPro "as a traditional rehab tool."  MAX 552.  Instead, Plaintiff seeks the MyoPro to

20   restore functional capacity.  Importantly, as noted, Plaintiff wishes to use the MyoPro for long

21   term, permanent use "in all aspects of his daily life," "from cooking and feeding himself at home,

22   to working around the house and preparing drawings on the computer for work."  UHC 44.  The

23   use of the MyoPro for rehabilitation does not show that the MyoPro is likely to be effective for

24   Plaintiff.  Even these studies, which examined the benefits of myoelectric orthoses for a different

25   condition from that of Plaintiff and for uses different from the one that Plaintiff seeks, are

26   generally circumspect in their conclusions about the efficacy of the MyoPro.  *See* ECF No. 202-5

27   at 35 (cautioning that conclusions in article were based on "just four trials including two by the

28

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

same research team and so should be treated with caution until replicated by other trialists"); ECF No. 202-7 at 6 ("Based on initial findings, myoelectric elbow-wrist-hand orthosis use *may* increase affected UE function and therefore may constitute a promising orthotic option in the rapidly expanding stroke population." (emphasis added)); ECF No. 202-12 at 260 (noting that as to use of myoelectric orthosis for stroke survivors, "[f]urther research in this application is needed, as is further development of the device to address issues of portability, ease of application, and comfort"); ECF No. 202-20 at 23 ("The effectiveness of robotic over conventional therapy is arguable and the best therapy strategy is still not clear.").

Two studies cited by Dr. Green do not fall into these categories.[3]  The first one is a 1967 article that examines myoelectric technology generally and concludes that further research into myoelectric technology is warranted.  ECF No. 202-6 at 111 (explaining that "[t]here is a need for rapid evolution of new ideas" in myoelectric technology).  At the time the article was written, the article concluded that "[t]he present state of the art represents a beginning, and only a beginning." *Id.*  Hence, this study does not indicate that the MyoPro is likely to benefit Plaintiff.

The second study cited by Dr. Green is the most relevant to Plaintiff.  Specifically, Dr. Green cited a case study entitled, *A Myoelectrically Controlled Shoulder-Elbow Orthosis for Unrecovered Brachial Plexus Injury*, 24 Prosthetics & Orthotics Internat'l 252–55 (2000).  In that case study, the authors followed two patients who suffered brachial plexus injuries for 21 months. *Id.* at 252.  The patients underwent six months of exercise and rehabilitation[4] using myoelectric orthoses, and the patients also used the myoelectric orthoses during their daily lives.  *Id.*  The authors concluded that "[a]fter 21 months it was found, in both cases, that the orthotic treatment had been successful and that the patients had been given the ability to engage in two-handed activities of daily living." *Id.*

_____

[3] Dr. Green cited a third study purely to provide background on a medical metric called the "Disability of the Arm, Shoulder and Hand (DASH) Outcome measure," which does not discuss myoelectric orthoses in any form.  MAX 556; ECF No. 202-4.

[4] The abstract says that "[t]he rehabilitation time was 3 months in both patients."  24 Prosthetics & Orthotics Internat'l at 252.  However, the article's discussion makes clear that the rehabilitation time was six months.  *Id.* at 254 ("The rehabilitation time was 6 months in both patients.").

28

United States District Court
Northern District of California

1   This study does not show that the MyoPro is likely to benefit Plaintiff.  First, as noted, the

2   case study primarily focused on the two patients use of the myoelectric orthoses for six months of

3   rehabilitation, in addition to using the orthoses during their daily lives.  There is no indication that

4   Plaintiff would undertake a similar rehabilitation regimen with the MyoPro.  Dr. Green merely

5   stated that Plaintiff would be "referred to a local occupational therapist . . . to optimize and

6   troubleshoot his functioning and adjust his EMG gains as needed with associated software."  UHC

7   44.  Second, neither of the two patients in the case study used a myoelectric orthosis for the length

8   of time that Plaintiff envisions.  As noted, Plaintiff seeks to use the device long-term, "for at least

9   5 years."  *Id.*  This is significant, as Physician #1 raised the concern that "[i]t is not well known

10   whether the users will adopt the device for regular functional use in the long term or if the device

11   itself will cause injuries with long term use (e.g., at the shoulder due to the equipment's weight)."

12   MAX 6.  Third, and finally, the case study followed only two patients, which raises questions

13   about whether the results of the case study are broadly generalizable.

14      On the other hand, Plaintiff claims that two of the numerous articles cited by the

15   independent medical reviewers were not "relevant to the review" and demonstrate that the

16   independent medical reviewers erred.  Plt. Br. at 14.  The Court disagrees.  First, Physician #3

17   cited an article that outlined a procedure for the use of myoelectric prosthetics in amputees.  ECF

18   No. 203-1.  That article concluded that the use of myoelectric prosthetics "portends great promise

19   but remains experimental."  *Id.* at 1161.  Plaintiff is not an amputee, but Dr. Green repeatedly

20   declared that Plaintiff is "functionally equivalent to an amputee."  MAX 80.  Moreover, although

21   the procedure described in the article used a prosthesis and not an orthosis, the device used

22   myoelectric technology similar to that of the MyoPro.  To the extent that the procedure discussed

23   in the article remains experimental, that conclusion provides some evidence that the MyoPro

24   would be experimental for Plaintiff.

25      Second, Physician #1 reviewed a source that Plaintiff contends "was not a medical study

26   and was focused on the various strategies to control [u]pper-limb robotic exoskeletons."  Plt. Br. at

27   14.  The fact that the source was not a medical study is irrelevant because, unlike the "Unproven

28   

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    Service(s)" exclusion, California law does not limit the sources on which independent medical

2    reviewers may rely.  Cal. Ins. Code § 10145.3(c)(3).

3          Plaintiff also argues that Defendant MAXIMUS "used the wrong standard" to review

4    Plaintiff's claim.  Plt. Br. at 13.  Plaintiff cites the fact that Defendant MAXIMUS said that

5    Defendant UHC "denied this request [for the MyoPro,] indicating that the requested device is

6    considered investigational for treatment of the enrollee's left brachial plexus injury."  MAX 1.

7    Plaintiff's argument is unclear, but Plaintiff apparently focuses on the fact that Defendant

8    MAXIMUS used the word "investigational" instead of "unproven" to describe the determination

9    by Defendant UHC.  However, Defendant MAXIMUS applies the same standard to "[h]ealth

10   claims that have been denied as being Experimental, Investigational or Unproven Services."  UHC

11   229.  Plaintiff concedes that Plaintiff's claim for the MyoPro falls into this category because

12   Defendant "UHC found the MyoPro 'Unproven.'"  Plt. Br. at 14.  Hence, Defendant MAXIMUS's

13   use of the word "investigative" is irrelevant.

14         Finally, Plaintiff argues that "[n]one of the reviewers acknowledge the intended use of the

15   MyoPro for long-term daily use to restore function for activities of daily living."  Plt. Br. at 13.

16   Not so.  As noted, Physician #1 specifically explained that "[i]t is not well known whether users

17   will adopt the device for *regular functional use in the long-term*, or if the device itself causes

18   injuries with long term use."  MAX 6 (emphasis added).  Neither of the other independent medical

19   reviewers suggested that they did not understand the reason Plaintiff sought the MyoPro, and each

20   of the independent medical reviewers specifically certified that they were "knowledgeable about

21   the proposed treatment through recent or current actual clinical experience."  MAX 4, 7, 10.

22   Plaintiff cites the fact that the independent medical reviewers "focus[ed] on studies that seek to

23   use the device for rehabilitation of stroke patients."  Plt. Br. at 13.  However, even the studies cited

24   by Dr. Green overwhelmingly fall into this category.  In fact, the total absence from the record of

25   any robust studies that examine the long-term use of a myoelectric device for the purposes

26   envisioned by Plaintiff weighs heavily in favor of Defendant MAXIMUS.

27         In light of the foregoing, the Court concludes that Defendant MAXIMUS properly

28
     Case No. 18-CV-07454-LHK
     FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

United States District Court
Northern District of California

1  concluded that the MyoPro "is not likely to be more beneficial for the insured than any available

2  standard therapy."  Because Defendant MAXIMUS's determination was correct, Defendant

3  MAXIMUS is not "individually liable" for the wrongful denial of benefits under ERISA §

4  502(a)(1)(B), and Plaintiff's claim as to Defendant MAXIMUS fails.

5  **B. Breach of Fiduciary Duty Claims under ERISA § 502(a)(3).**

6  Next, the Court considers Plaintiff's claims for breach of fiduciary duty under ERISA §

7  502(a)(3).  The Court begins with Plaintiff's claim against Defendant UHC and then turns to

8  Plaintiff's claim against Defendant MAXIMUS.

9  **1. Plaintiff Cannot Recover against Defendant UHC under ERISA § 502(a)(3).**

10  Plaintiff argues that Defendant UHC breached its fiduciary duty because Defendant UHC

11  "committed numerous errors throughout the claim process, including mischaracterizing Ben's

12  claim, reading numerous terms into the Plan language that did not exist, and citing clinical

13  research that was irrelevant to the use and purpose for which Ben sought coverage for the

14  MyoPro."  Plt. Br. at 17–18.  Plaintiff asserts that these errors "culminated in the improper denial

15  of coverage for the MyoPro."  *Id.* at 18.

16  As outlined above, the Court held that Plaintiff prevails on his claim for improper denial of

17  benefits under ERISA § 502(a)(1)(B) because Defendant UHC failed to prove by a preponderance

18  of evidence that the "Unproven Service(s)" exclusion applies.  Because Plaintiff's breach of

19  fiduciary duty argument is based on Defendant UHC's improper denial of the MyoPro to Plaintiff,

20  the Court concludes that ERISA § 502(a)(1)(B) affords Plaintiff an adequate remedy.  *See, e.g.*,

21  *Western v. Unum Life Ins. Co. of Am.*, No. CV 16-9527-JFW (ASX), 2018 WL 6071090, at *14

22  (C.D. Cal. July 3, 2018), *aff'd*, 798 Fed. Appx. 154 (9th Cir. 2020) ("Because Plaintiff's Section

23  502(a)(1)(B) claim affords him an adequate remedy for the same actions and inactions alleged in

24  his breach of fiduciary duty claim, Plaintiff has failed to state a breach of fiduciary duty claim

25  upon which relief can be granted.").  As the Court previously explained, "[i]n the instant case,

26  Plaintiff will be unable to obtain double recovery under ERISA § 502(a)(1)(B) and ERISA §

27  502(a)(3)."  ECF No. 181 at 37.

28

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1    Plaintiff argues that Plaintiff is entitled to injunctive relief pursuant to ERISA § 502(a)(3).

2    Plaintiff asks that Defendant UHC "be prohibited from relying on the Omnibus Codes and

3    research contained therein to deny coverage for the MyoPro when the evidence does not address

4    the purpose for which coverage is sought, to restore arm function to allow the user to engage in

5    activities of daily living." Plt. Br. at 19. Plaintiff also seeks to enjoin Defendant UHC from

6    "treat[ing] private insureds such as Ben differently than UHC's Medicare insureds, for whom

7    UHC routinely approves coverage of the MyoPro." *Id.*

8    However, Plaintiff's request for further injunctive relief would essentially seek relief for

9    future Plan members. Such a request "contravenes the general rules applicable to Article III

10   standing and its prudential limitations." *Brady v. United of Omaha Life Ins. Co.*, 902 F. Supp. 2d

11   1274, 1284 (N.D. Cal. 2012). The instant case is not a class action, and Plaintiff has made no

12   affirmative showing that Plaintiff is in a position to prosecute ERISA claims on behalf of third

13   parties. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (explaining that courts have

14   generally "not looked favorably upon third-party standing").

15   Moreover, an injunction of the kind Plaintiff seemingly envisions would be unworkable

16   and improper. "Courts have declined injunctive relief where the injunction sought is of such an

17   indeterminate character that an enjoined party cannot readily determine what conduct is being

18   prohibited." *Brady*, 902 F. Supp. 2d at 1284. The significance of any particular evidence about

19   the use of the MyoPro, including evidence contained within the Omnibus Codes, depends heavily

20   on the circumstances of each individual case, such as the patient's condition and medical history.

21   Hence, whether any evidence used by Defendant UHC for any future insured adequately

22   "address[es] the purpose for which coverage is sought," and whether Defendant UHC "treats

23   private insureds" differently than Medicare insureds, will be highly subjective and contestable.

24   For the same reason, the Court agrees that the requested injunctive relief would effectively make

25   the Court into a "*de facto* claims administrator" for claims involving the MyoPro. Plt. Resp. at 5.

26   Injunctive relief is improper.

27   Accordingly, the Court finds that Plaintiff is not entitled to recover for breach of fiduciary

28

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

1   duty against Defendant UHC in the instant case.  The Court now proceeds to consider whether

2   Defendant MAXIMUS breached its fiduciary duty.

3       **2.  Defendant MAXIMUS Is Not Liable under ERISA § 502(a)(3).**

4       Finally, Plaintiff argues that Defendant MAXIMUS breached its fiduciary duty "to

5   consistently adhere to the federal regulations governing external reviews, apply the terms of the

6   Plan correctly and to make consistent decisions with respect to the MyoPro."  Plt. Br. at 18.

7       As an initial matter, there remains an open question as to whether Defendant MAXIMUS

8   is in fact a functional fiduciary in the instant case.  As the Court has previously explained, "the

9   Court only denied summary judgment on the issue of whether Defendant MAXIMUS is a proper

10  defendant under 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3)."  ECF No. 195.  The

11  Court therefore indicated that Defendant MAXIMUS remained free to argue that Defendant

12  MAXIMUS was not in fact a functional fiduciary.  However, the Court need not conclusively

13  resolve Defendant MAXIMUS's status as a functional fiduciary because Plaintiff's claims for

14  breach of fiduciary duty against Defendant MAXIMUS would fail in any event.

15      First, because the Court concluded that Defendant MAXIMUS's decision with respect to

16  the MyoPro was correct, Plaintiff has not shown any separate and distinct harm as to any of the

17  breach of fiduciary duty theories.  *See, e.g.*, *Mullin v. Scottsdale Healthcare Corp. Long Term*

18  *Disability Plan*, No. CV-15-01547-PHX-DLR, 2016 WL 107838, at *3 (D. Ariz. Jan. 11, 2016)

19  (explaining that plaintiff's "breach of fiduciary duty claim depends on the success of her claim for

20  wrongfully denied benefits; if she is unsuccessful on Count I, then Count II necessarily fails

21  because she has not alleged separate and distinct harm").

22      Each breach of fiduciary duty theory against Defendant MAXIMUS also fails

23  independently.  First, Plaintiff claims that Defendant MAXIMUS violated 29 C.F.R. § 2560.503-1.

24  This regulation "implement[s] 29 U.S.C. § 1133."  *LeGras v. AETNA Life Ins. Co.*, 786 F.3d 1233,

25  1236 (9th Cir. 2015).  The Court already granted summary judgment to Defendant MAXIMUS on

26  Plaintiff's freestanding claim under 29 U.S.C. § 1133 and the implementing regulations.  ECF No.

27  181 at 39.  Plaintiff's attempt to repackage the theory as a breach of fiduciary duty fails for

28

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1 multiple reasons.  First, "29 U.S.C. § 1133 and the relevant regulations, 29 C.F.R. § 2560.503-1,

2 impose duties only upon benefit plans."  *Herzfeld v. Teva Pharmaceuticals USA, Inc. Omnibus*

3 *Welfare Plan*, No. 2:18-CV-09784-ODW (SSx), 2019 WL 8647729, at *6 (C.D. Cal. Aug. 26,

4 2019).  Defendant MAXIMUS is an independent review organization that contracts with the

5 California Department of Insurance and is not a benefit plan.  MAX 1.

6 　　　　Second, 29 C.F.R. § 2560.503-1(b)(5) explains that the function of the provision is to

7 ensure that "benefit claim determinations are made in accordance with governing plan documents

8 and that, where appropriate, the *plan provisions* have been applied consistently with respect to

9 similarly situated claimants."  29 C.F.R. § 2560.503-1(b)(5) (emphasis added).  Defendant

10 MAXIMUS does not apply the Plan provisions.   Instead, Defendant MAXIMUS only made the

11 factual determination required by California law, namely whether the MyoPro was "not likely to

12 be more beneficial for treatment of [Plaintiff's] medical condition than any available standard

13 therapy."  MAX 2; *see also* Cal. Ins. Code § 10145.3(a)(3) ("Each expert's analysis and

14 recommendation shall be in written form and state the reasons the requested therapy is or is not

15 likely to be more beneficial for the insured than any available standard therapy . . . .").

16 Accordingly, because Defendant MAXIMUS does not apply the Plan's provisions, 29 C.F.R. §

17 2560.503-1(b)(5) has no applicability to Defendant MAXIMUS.

18 　　　　Next, Plaintiff's invocation of 29 C.F.R. § 2590.715-2719(c) as a basis for breach of

19 fiduciary duty also fails.  The federal regulation cited by Plaintiff, 29 C.F.R. § 2590.715-2719(c),

20 does not apply when a state's independent medical review system "includes at a minimum the

21 consumer protections in the NAIC [*i.e.*, National Association of Insurance Commissioners]

22 Uniform Model Act," 29 C.F.R. § 2590.715-2719(c).  California's independent medical review

23 system, through which Defendant MAXIMUS performs independent medical reviews, falls into

24 this category.  *See, e.g.*, Joseph Friedman, Esq. et. al., *A Crystal Ball: Managed Care Litigation in*

25 *Light of the Patient Protection and Affordable Care Act*, Health Law, Dec. 2014, at 10 n.97

26 (noting that California independent medical review system meets all sixteen of NAIC minimum

27 standards).  Accordingly, 29 C.F.R. § 2590.715-2719(c) does not apply to Defendant MAXIMUS.

28

Case No. 18-CV-07454-LHK
FINDINGS OF FACT AND CONCLUSIONS OF LAW

United States District Court
Northern District of California

1    Finally, to the extent that Plaintiff argues that Defendant MAXIMUS failed to "apply the

2    terms of the Plan correctly and to make consistent decisions with respect to the MyoPro,"

3    Plaintiff's argument fails because Defendant MAXIMUS did not apply the terms of the Plan.

4    Instead, Defendant MAXIMUS only decided whether the MyoPro was "not likely to be more

5    beneficial for treatment of [Plaintiff's] medical condition than any available standard therapy."

6    MAX 2.  Moreover, the extent to which Defendant MAXIMUS's decisions on this factual

7    question were different in other cases involving different patients is irrelevant because the Court

8    determined that Defendant made the correct decision in the instant case.

9    In sum, based on the foregoing, the Court finds that Defendant MAXIMUS did not breach

10   any fiduciary duty under ERISA § 502(a)(3).

11   **IV.    CONCLUSION**

12   For the foregoing reasons, the Court finds that:

13   - Defendant UHC improperly denied coverage of the MyoPro to Plaintiff under

14     ERISA § 502(a)(1)(B);

15   - Defendant UHC did not breach its fiduciary duty under ERISA § 502(a)(3);

16   - Defendant MAXIMUS did not improperly deny coverage of the MyoPro to

17     Plaintiff under ERISA § 502(a)(1)(B);

18   - Defendant MAXIMUS did not breach its fiduciary duty under ERISA § 502(a)(3).

19   **IT IS SO ORDERED.**

20

21   Dated: August 12, 2020

22

23   LUCY H. KOH
     United States District Judge

24

25

26

27

28

35